JOSEPH T. MACAVOY, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

15 N. W. 2d 45

FILED JUNE 6, 1944.  No. 31774.

*August C. Krebs* and *D. B. Massie,* for plaintiff in error.

*Walter R. Johnson, Attorney General, H. Emerson Kokjer* and *Rush C. Clarke, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

CARTER, J.

The plaintiff in error, who will hereafter be referred to as the defendant, was convicted of first degree murder and a sentence of death imposed. Plaintiff in error brings the case to this court for review.

On Saturday evening, August 7, 1943, the defendant, Joseph T. MacAvoy, aged 23, a soldier stationed at the Harvard Army Air Base, went to Sutton, Nebraska, in company with other soldiers. Considerable drinking of intoxicating liquors was indulged in by the defendant and his

companions. During the forepart of the evening defendant purchased a used car. The only tool in the car at the time it was purchased was an automobile crank.

During the course of the evening defendant made an appointment to meet Anna Milroy, a local girl 16 years of age, at 11:30 p. m. At about the appointed hour defendant advised the others in his group that he had to return to the air base. He drove away, but came back and picked up Anna Milroy, who likewise by pretense had managed to separate herself from the group. They drove one mile south of Sutton, turned off on a little used county highway and parked the car on the right side of the road.

On August 9, the Monday following, the body of Anna Milroy was found in the ditch near the place where defendant's car was parked on Saturday evening. There were many severe bruises on the back of the head apparently made with a blunt instrument. There was a gash on the left side of the head which penetrated the skull and was apparently inflicted with a sharp instrument. The jaw was badly broken. There were numerous bruises and discolorations about the head and face. Numerous bruises and scratches appeared on the shoulders, arms, abdomen and legs. The head and face were covered with blood. Decomposition had commenced, indicating that death had taken place at some period of time previous to the discovery of the body.

On the Saturday evening when she was last seen on the streets of Sutton, Anna Milroy was wearing blue slacks, a pink blouse, and blue slippers. When her body was discovered she was wearing the same clothes. The legs of her slacks were pulled up to her knees and the upper part was pulled down from the waist below her hips. Her blouse was pushed up and was partly over her face, exposing the body from the hips to the breasts. The blouse was torn, one sleeve and the back being ripped open. The slacks were torn laterally in the crotch for six to eight inches. The underpants were torn, one section being entirely ripped out. They were down below the hips in approximately the

same position as the slacks. The heel of one slipper was broken off and was found in the immediate vicinity. Several buttons were torn from her clothing and were found near the body.

There was a pool of blood eight inches in diameter in the grass just off the traveled portion of the highway. There was a smaller pool of blood near the head and approximately nine feet from the larger one. Hair was found between the fingers of each hand. The body was removed to a mortuary where a picture was taken with the body in the same position it was in when it was discovered. The picture was received in evidence.

The defendant testifies that two other soldiers had informed him that the girl was an "easy make" and that he had dated her for that reason. He says that after the girl got into his car they drove to the place where the girl's body was subsequently found. His testimony is that they "petted" for a little while and then engaged in voluntary sexual intercourse on the ground near the car. They then sat in the car and visited until defendant made some remark or inquiry regarding whether Anna was free from venereal disease. He says that she then slapped him and he flew into a rage and struck her, that she got out or fell out of the car and that he grabbed her and tore her clothes as she left the car. He thereupon seized the car crank on the floor of his car and beat her over the head with it and drove away after he had dragged her into the ditch north of the road. He testifies that he then went back to the air base and went to bed. The next day he washed his car and remained on duty until evening. He then returned to Sutton and later in the evening returned to the scene of the tragedy. He says that he turned the body over on its back, discovered that the girl was dead and returned to Sutton and later to the air base. On Monday evening he was taken into custody by the officers, and late in the evening when he was being taken to Geneva for safe-keeping he confessed to the story that we have here related. He later reduced his confession to writing and signed it. It was received in evidence against him at the trial.

At the time he was taken into custody the crank which he asserted he used in killing the girl was not in his car, but was later produced and identified by him. There was found in the car at the time a chisel with a peculiarly split handle which made it easy to recognize. There is evidence that many of the wounds on the back of the head and the wound on the side of the head which penetrated the skull were of the exact size as the chisel and had the appearance of having been made by such an instrument. The defendant admits using the car crank in killing the girl, but generated a great deal of excitement whenever the chisel was mentioned. He claims he never used the chisel on the girl and that it was placed in his car by a soldier at the air base. The chisel was recognized as one which had been in a tool box in the room where defendant slept. It was not in the car on Saturday night, the night of the killing, because defendant had purchased his car that same evening and had never had it out to the air base. The chisel was used at the air base on Monday and one of the soldiers testified he put it in defendant's car before they left for Sutton on Monday evening.

It is upon this general state of facts that the jury found that defendant killed Anna Milroy in the perpetration of a rape and that defendant was therefore guilty of first degree murder as defined by section 28-401, Comp. St. 1929.

The defendant contends that the evidence is insufficient to sustain a finding by the jury that Anna Milroy was killed by defendant while perpetrating a rape upon her. We think the evidence is amply sufficient to sustain such a finding. There is evidence that the girl had had recent sexual intercourse with a man as was shown by a microscopic examination of the contents of the vaginal tract. There was ample evidence of force as was shown by the condition of her clothes and the manner in which they had been pulled up or down to afford access. That a struggle took place cannot be questioned. It requires no recitation of details to show that a jury could reasonably believe that Anna Milroy met her death as the result of a rape or an attempted rape. The evidence shows that the injuries then received were suf-

ficient to cause death. It is true that the defendant tells another story which would indicate that rape as a motive had been removed by the voluntary and concerted action of the parties before any physical assault was made. The jury did not believe this story and chose instead to believe that she met her death as the result of an attempted or perpetrated rape, a theory which was amply supported by the evidence and the physical facts. The defendant did not attempt to explain, if his version of what happened were true, why the girl's clothing was disarranged in such a manner as to afford sexual access. Neither does he explain the marks and bruises on the lower limbs and body which strongly indicated that gratification of sexual desires was the objective. All the circumstances indicate that rape was the motive and no reason is shown for their existence if defendant's story were true.

When a person is killed by another in the perpetration of or attempt to perpetrate a rape, an intent to kill is not a necessary element of the crime. It is first degree murder, whether an intent to kill be shown or not. *Morgan v. State,* 51 Neb. 672, 71 N. W. 788. The defendant urges, however, that the killing occurred after the act of sexual intercourse took place and, consequently, it was not a killing in the perpetration of a rape. There is no merit in this argument. If a killing is committed within the *res gestæ* of the felony charged it is committed in the perpetration of, or attempt to perpetrate, the felony, within the meaning of the statute. *Francis v. State,* 104 Neb. 5, 175 N. W. 675. The reasons for this rule are well stated in *Bissot v. State,* 53 Ind. 408. wherein it is said: "Although we must construe criminal statutes strictly, adhere closely to the definition of crimes, and interpret technical words according to their fixed meaning, yet we cannot give to the section under consideration the construction contended for by the appellant. In our opinion, where the homicide is committed within the *res gestæ* of the felony charged, it is committed in the perpetration of, or attempt to perpetrate, the felony, within the meaning of the statute; and, being convinced in this case

that the burglary charged was committed, and that the homicide was committed within the *res gestæ* of the burglary, we must hold that it was committed in the perpetration of the burglary, within the true intent and fair meaning of the statute. It seems to us that such a construction is safe to the State and the citizen, and the only one by which the intention of the legislature can be practically carried into effect." See, also, *Conrad v. State,* 75 Ohio St. 52, 78 N. E. 957; *Commonwealth v. Osman,* 284 Mass. 421, 188 N. E. 226; *State v. Whitfield,* 129 Wash. 134, 224 Pac. 559.

Complaint is also made that the state failed to prove that Anna Milroy was killed by the defendant in the perpetration of a rape; that the evidence does not show that any rape was perpetrated or attempted. We have held many times that to sustain a conviction for crime the *corpus delicti* must be proved beyond a reasonable doubt and that it can properly be established by circumstantial evidence. *Maher v. State, ante,* p. 463, 13 N. W. 2d 641. The evidence and circumstances here shown are ample to sustain the conclusion reached by the jury.

Defendant urges that the trial court should instruct only on such degrees of homicide as find support in the evidence and infers that the trial court failed in this respect. The information charged the defendant with first degree murder on two counts. The first was on the theory that defendant killed Anna Milroy in the perpetration of a rape. The second count was on the theory that defendant returned to the scene of his crime on the night following and finding the girl still alive, completed the crime with the aid of a sharp instrument by projecting it through the skull and into her head. There is sufficient evidence to submit both theories to the jury.

Defendant contends there was error in the admission of the various articles of clothing in evidence. We quite agree with defense counsel that torn and blood-covered clothing may not be properly in evidence where its only purpose is to horrify the jury. But where such articles of clothing have evidentiary value in determining the nature and mo-

tive for the assault, they may properly be received in evidence. *Hanks v. State*, 88 Neb. 464, 129 N. W. 1011; *Simmons v. State*, 111 Neb. 644, 197 N. W. 398; *Egbert v. State*, 113 Neb. 790, 205 N. W. 252.

Complaint is also made of the court's ruling permitting the picture of the girl in evidence, showing the position and condition of her clothing when she was found and the wounds which had been inflicted upon her. Where a photograph illustrates or makes clear some controverted issue in the case, a proper foundation having otherwise been laid for its reception in evidence, it may properly be received, even though it may present a gruesome spectacle. *Blazka v. State*, 105 Neb. 13, 178 N. W. 832; *Bassinger v. State*, 142 Neb. 93, 5 N. W. 2d 222.

It is also urged that the trial court erred in admitting the chisel in evidence. The chisel was found in defendant's car at the time he was taken into custody. There is evidence tending to show that an instrument similar in size was used in inflicting the wound which extended through the skull and into the brain. There is expert evidence in the record that the girl was alive when this wound was inflicted. The chisel fit into the opening in the skull with exactness. It is true that there is evidence that defendant received the chisel into his possession on Monday afternoon shortly before his arrest. The chisel was ordinarily kept in the room where defendant slept. It must be pointed out, also, that defendant was convicted of killing Anna Milroy in the perpetration of a rape on the Saturday night of August 7, as charged in the first count of the information. The chisel, in so far as the evidence shows, played no part in the killing if it occurred on that night. The chisel was offered as part of the proof that defendant returned to the scene of his crime on Sunday night, found Anna alive and proceeded to terminate her life with some sharp instrument, claimed by the state to have been the chisel received in evidence. Under the circumstances shown the rights of the defendant were not prejudiced by the reception of the chisel in evidence. *Bassinger v. State, supra.*

Exceptions are taken to the instructions given by the trial court. We have examined them and find that they correctly state the law governing such cases. No error has been pointed out and we have found none in our scrutiny of them.

It is urged that the sentence of the court is excessive and that, in the event the conviction is sustained, this court should reduce the sentence by virtue of the power vested in the court to so do by section 29-2308, Comp. St. 1929. The defendant contended that he killed the girl while in a fit of temporary insanity. A medical expert in the field of neurology and psychiatry testified that the defendant was technically classified as a psychopathic personality with an abnormal emotional response which is made worse by the use of alcoholic beverages. It was his opinion that defendant was in such a mental state at the time the crime was committed that he was unable to distinguish right from wrong. There was expert evidence to the contrary. The evidence of several lay witnesses who had known the defendant for several months was to the effect that in their opinion he was sane on and after the time of the killing. The issue was properly submitted to the jury, who determined it contrary to the claims of the defendant. Defense counsel contend that defendant was abnormal when the crime was committed and that we should recognize and give effect to that fact by reducing the sentence. We think the defendant was abnormal when he committed this gruesome crime. We do not think any normal person could do the things the defendant did and have any valid claim of normalcy thereafter. The legislature, in drafting and enacting our homicide law and in providing the penalties for its violation, must have felt that crimes would be committed by such abnormal persons as would warrant the infliction of the death penalty. The test is whether defendant had sufficient mental ability to distinguish between right and wrong in respect to the particular things he did in causing the death of this girl. The jury found that he was responsible for his acts. We think the evidence shows that the jury were entirely correct in so finding. The crime here committed is so

gruesome and depraved in character that a reduction of the sentence prescribed by the jury and imposed by the trial court would amount to a holding that capital punishment will never be enforced in this state, irrespective of the legislative enactments on the subject. We can find no justifiable reason for substituting our judgment for that of the jury and the trial court in prescribing and assessing a penalty which the law authorizes in such cases. The accused has had a fair trial, free even of any technical error. The judgment of the district court is in all respects affirmed, and Friday, September 29, 1944, between the hours of six o'clock a. m. and six o'clock p. m. of said day, is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.